

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00165-CV

_____

CARLYE JONES MILLER, Appellant

V.

MICHELLE WATKINS, Appellee

On Appeal from the 393rd District Court
Denton County, Texas
Trial Court No. 19-11600-393

Before Kerr, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

In this accelerated appeal, Appellant Carlye Jones Miller raises two issues challenging the trial court's denial of a motion invoking the provisions of the Texas Citizens Participation Act (the TCPA or the Act) by which she sought to dismiss Appellee Michelle Watkins's suit against her. Watkins's suit alleged causes of action against Miller for defamation and tortious interference with actual and prospective contract. The suit alleged that Miller had made defamatory statements to various governmental and private individuals when she challenged whether Watkins should be permitted to teach classes at a school where Miller's daughter was a pupil.

Miller moved to dismiss Watkins's suit claiming that the statements that she made were an exercise of rights protected by the TCPA. Watkins responded to the motion by filing several items of evidence that she argued established a prima facie case for each essential element of the claims that she had brought against Miller. The trial court found that Watkins had met her burden to establish a prima facie showing that her claims were meritorious and should not be dismissed.

We conclude that the trial court's ruling was correct. This opinion focuses on our conclusion that Watkins presented prima facie proof establishing the elements of her defamation claim. Because this conclusion is dispositive, we do not address whether Miller properly invoked the TCPA. Also, we do not address whether Watkins presented prima facie proof of her tortious-interference claim because that

2

appellate contention was waived by Miller due to being inadequately briefed. We also overrule Miller's contention that Watkins lacked standing to bring her suit because she failed to comply with the Texas Defamation Mitigation Act and that the trial court should have considered Watkins's request for injunctive relief to be a discrete legal action that is subject to dismissal under the TCPA.

## II. Background

### A. Factual background

To set the scene for the parties' dispute, Miller and Watkins each have daughters who attend the same elementary school, are in the same grade, and are friends. Miller and Watkins were both active in the parent–teacher organization (PTO) of the school that their daughters attended. Watkins was one of the parents who taught a PTO-sponsored art class called Meet the Masters and was also qualified as a substitute teacher for the school. It is apparent from the record that Miller and Watkins have a history of conflict.

The controversy that led to Watkins's suit against Miller was sparked by an electronic message that Watkins sent her ex-husband, with whom she shared custody of her daughter. The message objected to their daughter's spending time in Miller's home. The message claimed, among other things, that there had been "a number of incidents at the school involving that family that [were] concerning," that a police report had been filed against Miller for harassment, and that they (presumably members of the Miller family) had disparaged Watkins's ex-husband.

The message was passed to Miller. The receipt of the message produced several actions by Miller. She stated her views about Watkins on Facebook, texted and telephoned other parents who were also in contact with Watkins, and contacted the principal of the school that Watkins's and Miller's daughters attended. What Miller said is documented in the record, which includes copies of her texts and Facebook posts and copies of her emails and other communications with the school. These documents became part of the record because other parents who texted with Miller or were friends with her on Facebook attached copies of the texts and posts to declarations that Watkins filed in support of her response to Miller's TCPA motion to dismiss. A business-records affidavit from the school district's custodian of records attached the communications that Miller had with the principal of the elementary school and also with other school district officials. The attachments to the business-records affidavit total 229 pages and span communications over a four-month period.[1] Further, the other parents outlined in their declarations what Miller had allegedly said about Watkins during telephone conversations.

Below, we will outline the statements that Miller allegedly made about Watkins. To give context to some of the statements, we note that Watkins concedes that certain statements that Miller made about her past are true. Watkins acknowledged

---

[1] As we discuss below, Miller reiterates on appeal the various objections that she made to the declarations that Watkins filed (though we conclude her arguments are waived). She does not argue on appeal that the trial court erred by failing to sustain objections that she made to the contents of and attachments to the school district's business-records affidavit.

4

that she had been arrested for public intoxication ten years prior to the suit. Miller also obtained and provided to the school a ten-year-old record of a CPS "Family Team Plan," which was apparently at least partially prompted by the public-intoxication arrest and required supervised visitation for a period of time when Watkins visited with her children.

Miller asserted that her impetus for communicating with the school's principal about Watkins was "because [Watkins] actually substitutes for the school and helps with the art program [and because Miller] felt like this finally needed to be addressed." During her communications with the school, Miller made a host of statements about Watkins. These included the following:

- Though Miller did not think that Watkins would harm Miller's daughter, Miller's daughter felt unsafe around Watkins.

- Miller stated, "If she was just a crazy parent slandering my name, I wouldn't be talking to you guys right now[;] but she is employed at the school and she is around my children and I really don't feel safe like we have been for all of these years."

- Miller claimed that "all you have to do is talk to enough people to know that there is something psychologically wrong with [Watkins,]" but Miller would not provide names because she did not want others dragged into the controversy.

- Watkins had "CPS charges including child endangerment and public intoxication," and Miller obtained copies of records "to ensure Ms. Watkins [was] no longer allowed on campus."

- "Watkins ha[d] been to a mental hospital and was institutionalized . . . ."

- Miller obtained public records "to show that Watkins should not be at school."

- Watkins is "adult bullying at its finest."

- Miller planned to contact CPS to communicate about the email that Watkins had written to her ex-husband.

- The police told Watkins to stop "following" Miller.

- According to Miller, "[t]he psychological abuse on [Watkins's] kids by [Watkins] is sickening."

- Miller had proof that Watkins had been stalking her on social media, allegedly confirmed by Miller's conversation with Watkins's son.

- Miller knew of no instances of Watkins's misconduct that had occurred at the school; but Watkins volunteered at the school, and Watkins's efforts to slander Miller had to stop.

- Miller stated that she had "talked to [the] local police department" and that they were going to set up a meeting for her with an investigator, "but they said [Miller] should go ahead and talk to the school to see if [the school was] going to do something."

6

- Miller reported that she had

  [j]ust finished with the investigator. He will be contacting [Watkins] to stop harassing me and saying things that aren't true and searching my social media. . . . The investigator is also going to contact the ISD police to let them know what's going on because even though she hasn't done anything at the school that we know of (other than negatively affect the kids['] friendship)[,] they need to be aware that she's been told to stop.

- Miller's daughter was excluded from activities because of the actions of "an evil mother. That is BULLYING."

- Watkins's child "is afraid of her mother." Watkins punishes her daughter for associating with Miller's daughter, and "[t]his is sick behavior."

- "This situation has gotten out of hand and goes beyond the harassment that we've been dealing with for the last few years. A parent involved at the school is FORCING her child to exclude her best friend[—]all for her own evil agenda."

- Watkins had "public intoxication[,] among other things[,] on her record[,]" and Miller forbade Watkins to be anywhere near her daughter.

- Miller asked the school to "keep [Watkins] away from [Miller's daughter] anytime [Watkins was] at the school volunteering."

- Miller stated that she had "to involve CPS now because [Watkins] should not be around my child ever. There is no reason that children should be hiding scared at the school that they attend because of a horrible volunteer mother."

7

- "How hard is it to get the one person hurting EVERYONE[] out of the school?  At least [for] the remainder of this year."

- "Watkins is BULLYING my family AND her own daughter."

- "What you guys did, by excluding my child instead of removing the bully is very disturbing."

- Miller "found out that [she was] not able to get [Watkins's] [c]hild endangerment records or the records of her being in a mental hospital[,] but her ex-husband [was] in the process of doing that because she's causing so many problems for them as well."

- "[Watkins] has to stay away from the school until my child is gone."

- Miller stated that she had "contacted our police department AGAIN, and they're in the process of getting an email together stating that [] Watkins is slandering my name by saying that I have charges against me.  Not only is she hurting my child, she's hurting her own child and making it HELL for me when it comes to volunteering at my kids['] school.  This is all ILLEGAL what she is doing[,] and you guys aren't taking it seriously."

- Miller provided notes from the local police department, which described the interaction that both Miller and Watkins had with police.  The notes also stated,

    I, M. Dusek #406, met with Carlye Miller, a white female of Krugerville, Texas.  She had spoken with Officer Bray #416 on 10-24-19 regarding a potential harassment issue between her and Michelle Watkins, a teacher at Brockett Middle School involving both of their daughters . . . .  I

advised her the best way to quash the issue was to deactivate her Facebook page as Watkins was likely using friends of friends to back door into her page. Miller had also spoken with [the] Principal [] at Brockett[,] and [the Principal] agreed to keep Watkins away from [Miller's daughter] while at school; she would not allow Watkins to teach [her daughter]'s class. Miller stated that the common element in the harassment is . . . the biological father of [Watkins's daughter] and ex-husband of Michelle Watkins. In conclusion, Miller was advised that posts on social media are viewed as an extension of the First Amendment right to freedom of speech and that a criminal offense may not be applicable in this case. However, I also advised her that Michelle Watkins would be advised to cease her stalking of Miller online and through social media. I contacted Aubrey ISD Police Chief Collins to advise Watkins of the issue at hand and to notify her in person to refrain from stalking, harassing, or impersonating Miller. . . .

I, Officer B. Bray #416, spoke with Carlye Miller of Krugerville, regarding an ongoing issue with Michelle Watkins of Aubrey. Miller stated that she believes that Watkins has been creating false Facebook profiles in order to spy and send message[s] to other individuals to "slander" Miller. Miller said that Watkins is in a group of school parents that "just don't like her[."] I advised Miller of the law regarding online impersonation and that there could possibly be a criminal charge if Watkins has been using information of another person to create the profiles and using them with the intent to harm Miller. Miller has a scheduled meeting with the school, which both parties['] children attend, and [she] stated that after the meeting if nothing can be worked out with the school and Watkins, she would gather any information and evidence she has of Watkins using a fake profile to harm her and bring it to the PD. I also advised her that slander and defamation falls under Texas civil code.

- Miller emailed the school stating that she had an "email where [Watkins was] slandering [Miller's] name and saying that the school 'knows about me'" and included an email as "proof from the police department that what she's saying [was] false and flat out lies. Someone like this should not be volunteering at the school. Needs to stay away from my child like I was told."

9

- In another email to the school, Miller stated,

  [Watkins] is the bully here. . . . Why is it not enough that I have proof that she stocks [sic] my social media and proof that she said I have a harassment charge against me and I have the police department saying that that's a lie. How can she continue to torment these two children at the school?

- "A volunteer at the school cannot make up lies about another parent when the police department [was] saying [that] her words [were] not true."

- "Watkins will continue to harass and hurt me and my family."

- When Miller provided the school a CPS report dated more than ten years before the present controversy, she characterized it as follows: "This is the CPS meeting showing everyone on the first page that has first[-]hand knowledge of [Watkins's] arrest for Public Intoxication. It shows that she could only have supervision with her own children and also that she had a drug and alcohol problem that caused an intervention."

- Miller also provided the school with a copy of a mug shot of Watkins as documentation of her arrest for public intoxication and accompanied what she sent with an email stating that

  Yellow line 3 is her public intoxication arrest from March 28, 2010. This is her[ ]mug shot from jail. I am doing this because I have been told she is taking me to court. Having all the details are important. She attacked me FIRST. I am only doing this because facts have to be shown.

- "Even though [Watkins's] arrest and CPS involvement happened many years ago, she is PRESENTLY hurting my family, MOSTLY my child[.] For a

10

school that shouts a no[-]bullying policy[,] I'm deeply disturbed that two kids have talked to the school with the same story and nothing is being done."

- "All she does is LIE."

- "You all need to be aware that you have sided with an evil liar so now many more people are going to have to go through this unnecessary court appearance."

- "Watkins (a parent and volunteer) has been stalking/harassing me for years."

- "My child no longer feels safe at the school not only because of [] Watkins.

Miller also provided the school with documents from the local police department that detailed her contacts with them. Specifically, she provided a letter from an investigator that she claimed proved that she had not filed criminal charges against Watkins, but the letter also indicated that she had reported potential criminal conduct. Specifically, the letter stated that

> [a]s of this date, January 9, 2020, Carlye Miller has not filed a police report against Michelle Watkins with the [police department]. Carlye Miller had been in contact with officers of the [police department] to describe a potential criminal offense and request insight as to her options moving forward; however, no police report or criminal charges have . . . been filed and are not being considered at this time.

Immediately after Watkins filed suit, Miller initiated an appeal process with the school district of the school that Watkins's and Miller's daughters attended. The school-district appeal had two bases. First, Miller claimed that the school's principal had lied about statements her daughter had made to the school. Second, Miller

11

claimed that it was not until after the school officials had lied that she sought to have Watkins removed as a volunteer at the school. The school district denied the appeal and observed that a number of statements made by Miller that sought to exclude Watkins from volunteering at the school predated the events that she claimed were her motivation for having Watkins excluded.

As noted above, two parents of children attending the school attended by Miller's and Watkins's daughters swore to declarations that Watkins filed to establish a prima facie case of her claims against Miller. One of the parents itemized the statements that Miller had made as follows:

> Between the text messages and the phone calls, Carlye Miller made the following statements about Michelle Watkins:
>
> a) that [Watkins] had removed everything out of her daughter's room and forced her to sleep on the floor as punishment for associating with Carlye Miller's daughter;
>
> b) that [Watkins's] daughter didn't want to live with [Watkins];
>
> c) that [Watkins] doesn't need to be at Brockett Elementary School;
>
> d) that [Watkins] has a criminal record and [a] CPS record that precludes her from being at the school;
>
> e) that it is unsafe for children to be around [Watkins], including [Watkins's] own children;
>
> f) that [Watkins] stalked her ex[-]husband's house when their children [were] in his possession;

g) that [Watkins had] stalk[ed] Carlye Miller on Facebook and [had] create[d] fake profiles to "friend" Carlye Miller so [that] she [could] troll her [on] social media;

h) that [Watkins] is unstable;

i) that [Watkins] should not have her position at the school because she is not safe; [and]

j) that Carlye Miller is worried for the safety of [Watkins's] daughter because [Watkins] is not stable.

The other parent stated in her declaration that

[b]etween the text messages and the phone calls, Carlye Miller made the following statements about Michelle Watkins to me:

a) that [Watkins] was not fit to be at the school;

b) that [Watkins] was abusive to children;

c) that [Watkins] abuses her own child;

d) that [Watkins] is a trouble maker;

e) that [Watkins] is dangerous;

f) that [Watkins] should be removed as the teacher for Meet the Masters;

g) that [Watkins had] stalk[ed] Carlye Miller on Facebook and [had] create[d] fake profiles to "friend" Carlye Miller so [that] she [could] troll her [on] social media; [and]

h) that [Watkins] is unstable.

Watkins also filed her own declaration, detailing the statements that she contends that Miller had made about her and declaring that the statements are false:

Beginning in August 2019 and continuing to this date, Carlye Miller has made false claims about me and continues to send these false claims to others. I am aware that she has made at least the following false claims about me:

a) that I took everything out of my daughter's room and forced her to sleep on the floor of her bedroom as a punishment for being friends with Carlye Miller's daughter;

b) that my daughter doesn't want to live with me any longer;

c) that I don't need to be and shouldn't be at Brockett Elementary any longer;

d) that children are not safe around me;

e) that I stalk Carlye Miller;

f) that I stalk my ex-husband;

g) that I am unstable;

h) that I am insane and mental;

i) that I bully children at Brockett Elementary School;

j) that I stalk Carlye Miller on Facebook and make fake profiles so that I can "friend" Carlye Miller and watch her social media;

k) that I have a criminal record that precludes me from remaining as a teacher for Aubrey ISD or a volunteer teacher for Brockett Elementary School;

l) that I have a CPS record that precludes me from remaining as a teacher for Aubrey ISD or a volunteer teacher for Brockett Elementary School;

m) that I should not have my position at Brockett Elementary School because I am not safe;

n) that I am not fit to be at a school;

14

o) that I am dangerous;

p) that I am abusive to children;

q) that I have abused my own children;

r) that I am a "trouble maker";

s) that I am a liar;

t) that I am not allowed to teach at Brockett Elementary School;

u) that an investigator with the police has told me to stop stalking/harassing Carlye Miller or others;

v) that I should have my own children removed from my custody;

w) that I took cheer away from her;

x) that I have been hurting Carlye Miller and her children for years;

y) that I harass and slander Carlye Miller;

z) that I lie about her to others;

aa) that I am an evil mother;

bb) that I have bullied her daughter, Carlye Miller herself[,] and her whole family;

cc) that I am hurting EVERYONE and BULLYING Carlye Miller and her daughter and family;

dd) that I interfered with the "cheer situation";

ee) that the police told [Miller] that what I say is not true, that I speak lies and slander[,] and [that I] have stalked [Miller] for years.

Both of the other parents who signed declarations stated that the matters they had described were brought to their attention by Miller and not Watkins. The parents also stated that "Carlye Miller told me that she was going after Michelle Watkins and that if Michelle Watkins doesn't stop, Carlye Miller was going to have to take this to the next level." One parent also stated that in response to the parent's statement asking Miller to cease making statements about parents on Facebook, Miller responded that she had the right to do so and that this was "how [she] retaliate[s]."

## B. Procedural background

In response to Watkins's suit, Miller filed a general denial and then her motion to dismiss under the TCPA. The exhibits attached to the motion to dismiss were a copy of the divorce decree between Watkins and her ex-husband and brief affidavits executed by Miller and her husband. Miller's affidavit stated that Watkins had inappropriately involved Miller's daughter in disagreements that Watkins had with her ex-husband, that Watkins had harassed her, that Watkins had created fake social media accounts to spy on her, that Miller had met with school officials to discuss her concerns, and that Watkins had never discussed Miller's concern with her but had sued her without warning. Miller's declaration also described Watkins's criminal history. Watkins responded with the declaration and evidence we have outlined above. At the time she filed her response to Miller's TCPA motion to dismiss, Watkins also filed a "First Supplemental Original Petition" that augmented the factual

16

allegations of her originally filed petition by, among other things, explicitly pleading Miller's allegedly defamatory statements that Watkins cataloged in her declaration.

The trial court conducted a hearing on the motion to dismiss. The trial court then entered an order ruling on the objections that each party had filed to the other's evidence and entered an order denying Miller's motion to dismiss. The trial court made the following findings as set forth in the order denying Miller's motion to dismiss:

> 1. [Miller] satisfied her burden of proof; the Texas Citizens Participation Act (TCPA), Tex. Civ. Prac. & Rem. Code §§ 27.001–.011, applies to this case.
>
> 2. Whether [Watkins] is a public figure for a limited purpose is a question of fact.
>
> 3. [Watkins] has satisfied her burden of proof to proceed on her causes of action for defamation and tortious interference.
>
> 4. [Watkins] submitted sufficient, admissible[,] clear and specific evidence on each element of her defamation and tortious[-]interference claims pursuant to Tex. Civ. Prac. & Rem. Code § 27.005(c) to overcome [Miller's] Motion to Dismiss.
>
> 5. Without finding whether [Watkins] was a public figure for a limited purpose, the admissible evidence submitted by [Watkins] was sufficient to overcome the Motion to Dismiss even under the *New York Times Co. v. Sullivan*, 376 U.S. [254], 84 S. Ct. 710 (1964) heightened standard of proof.

Miller then filed a notice of appeal.

## III. Analysis

**A.     We set forth the purpose and framework of the TCPA and the standards of analysis and review that we apply.**

The TCPA states that its purpose is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code Ann. § 27.002.

The Act's framework utilizes a three-step process to resolve whether a claim is subject to the strictures of the TCPA and, if so, whether the claim should be dismissed or allowed to proceed because it appears to have merit. The three steps are as follows: (1) the party invoking the TCPA must demonstrate that a "legal action" has been brought against it that is "based on or is in response to" an exercise of the rights of free speech, petition, or association protected by the Act; (2) if the moving party successfully invokes the Act, "[t]he court may not dismiss a legal action under this section if the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question[;]" and (3) if the nonmoving party carries its burden, the case may still be dismissed "if the

moving party establishes an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." *Id.* § 27.005(b)–(d).[2]

In this appeal, we assume that Watkins's suit was brought in response to Miller's exercise of rights protected by the TCPA. Our focus is on the question of whether Watkins carried her burden under the second step to present clear and specific evidence to establish a prima facie cause of action for defamation against Miller. We conclude that Watkins did.

We begin our discussion by describing the specialized body of law that has been created to define the prima facie burden a party responding to a TCPA motion to dismiss bears, to define the words used by the Act, and to explain the Act's concepts of proof. The salient governing principles are as follows:

- To present "clear and specific" evidence, the nonmovant "must provide enough detail to show the factual basis for its claim" and must provide enough evidence "to support a rational inference that the allegation of fact is true." *Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019).

---

[2]We do not deal with the third step in this case. Miller did not plead, nor does she argue on appeal, any affirmative defense of privilege to Watkins's defamation claims. *See Burbage v. Burbage*, 447 S.W.3d 249, 254 (Tex. 2014) (stating that a qualified privilege is available as an affirmative defense when "communication is made in good faith and the author, the recipient or a third person, or one of their family members, has an interest that is sufficiently affected by the communication").

- The words "clear and specific" are defined to mean, for the former, "'unambiguous,' 'sure,' or 'free from doubt'" and, for the latter, "'explicit' or 'relating to a particular named thing.'" *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (orig. proceeding).

- "The [party responding to a TCPA motion to dismiss] may rely on circumstantial evidence—indirect evidence that creates an inference to establish a central fact—unless 'the connection between the fact and the inference is too weak to be of help in deciding the case.'" *Dall. Morning News*, 579 S.W.3d at 377 (quoting *Lipsky*, 460 S.W.3d at 589).

- The nonmovant surmounts its burden of establishing a prima facie case when the evidence presented is "sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Lipsky*, 460 S.W.3d at 590. Stated differently, the burden is met by "the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Id.* (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding)).

- Statements that are conclusory or evidence that is speculative is not sufficient to carry the nonmovant's burden. *Mogged v. Lindamood*, No. 02-18-00126-CV, 2020 WL 7074390, at *9 (Tex. App.—Fort Worth Dec. 3, 2020, pet. filed) (en banc op. on reh'g).

20

Overall, we review a trial court's denial of a TCPA motion to dismiss de novo. *Robert B. James, DDS, Inc. v. Elkins*, 553 S.W.3d 596, 603 (Tex. App.—San Antonio 2018, pet. denied). In reviewing a ruling on a TCPA motion, "[w]e view the pleadings and evidence in the light most favorable to the nonmovant." *Id.*

**B.     We conclude that Watkins presented prima facie proof on the elements of her defamation claim against Miller.**

**1.     There are four elements of defamation.**

Miller's first issue makes a variety of arguments attacking the trial court's denial of her TCPA motion to dismiss. As the parties do in their briefs, we concentrate on the question of whether Watkins presented prima facie proof on each element of her defamation claim. The Texas Supreme Court recently stated the elements of defamation as follows:

> [A] plaintiff must show (1) the publication of a false statement of fact to a third party[;] (2) that was defamatory concerning the plaintiff[;] (3) with the requisite degree of fault, at least amounting to negligence[;] and (4) damages, in some cases. A defamatory statement is one that "tends [] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."

*Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417 (Tex. 2020) (citations omitted).

In order for a party responding to a TCPA motion to dismiss to make a prima facie showing of the elements of defamation, the party's pleadings and evidence must

21

establish "the facts of when, where, and what was said[;] the defamatory nature of the statements[;] and how they damaged the plaintiff." *Lipsky*, 460 S.W.3d at 591.

> **2.    In reviewing whether Watkins established a prima facie claim for defamation, we do not require prima facie proof that every statement allegedly made by Miller was defamatory.**

We initially explain how we approach the review of whether Watkins established a prima facie case of defamation. As the Fourteenth Court of Appeals recently explained, we are not required to determine that each and every statement that Miller made is defamatory in order to conclude that Watkins carried her burden to prove that she has a viable cause of action for defamation. *See Stone v. Melillo*, No. 14-18-00971-CV, 2020 WL 6143126, at *5 (Tex. App.—Houston [14th Dist.] Oct. 20, 2020, no pet.) (mem. op.). Instead, the inquiry is whether Watkins presented sufficient proof to establish a viable defamation cause of action, and that task requires only that we determine whether any of the statements made by Miller were defamatory. As the Fourteenth Court explained,

> While the TCPA requires that each legal claim be analyzed individually, the TCPA does not require that each factual basis or theory of recovery underpinning a cause of action must be analyzed separately. Tex. Civ. Prac. & Rem. Code § 27.005(c). Here, Appellees have a single defamation cause of action, which is based upon statements made by [Appellant] in a flyer he publicly distributed and a sign he publicly displayed. If Appellees are successful in presenting prima facie proof in support of their defamation claim as to any of the statements in the flyer or sign, then Appellees will have met their burden under the second step. *See . . . Bui*[ *v. Dangelas*], No. 01-18-01146-CV], 2019 WL 5151410, at *5 [(Tex. App.—Houston [1st Dist.] Oct. 15, 2019, pet. denied) (mem. op.)]; *see generally Landry's, Inc.*[ *v. Animal Legal Def. Fund*], 566 S.W.3d [41,]

22

53–57 [(Tex. App.—Houston [14th Dist.] 2018, pet. granted)]. The TCPA does not require that Appellees produce evidence that each and every statement in [Appellant's] flyer is defamatory to meet their burden under the TCPA[] or to prove their cause of action at a trial on the merits. Rather, Appellees must establish "a prima facie case for each essential element" of their defamation claim against [Appellant]. Tex. Civ. Prac. & Rem. Code § 27.005(c).

*Id.* at *6. Thus, we will highlight certain of the statements that Miller made and why we conclude that they were defamatory.[3]

### 3. With regard to the first element of defamation, there is prima facie proof that Miller published a false statement of fact about Watkins to a third party.

The principles that guide the determination of whether Watkins has established prima facie proof of the first element of her defamation claim are as follows:

- Did Miller make statements of fact? This determination turns on whether the statements are verifiable. *See Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614,

---

[3]Much of Miller's brief simply repeats objections made to the declarations that Watkins filed in response to Miller's motion to dismiss. The brief appears to mostly cut and paste fifty-seven separate objections, which consume nineteen pages. The objections rely on various rules of evidence but go no further than simply giving the number of the rule without further explanation of its terms or its application. For example, "[Miller] objects to Michelle Watkins's Declaration, Paragraph 13, under Tex. R. Evid. 104(b), 401, 402, 602, and 611." In some of the objections, Miller cites to particular language in the declarations to which she objects, and in others, she does not. Basically, each of the objections requires us to decipher which portion of the cited rule applies to Miller's objection, analyze how that portion impacts the objected-to portion of the declarations, and then decide how we should rule on the arguments that we assume Miller is making. Miller's brief waives error on the declaration objections by placing the burden on us to brief, argue, and assume the bases of Miller's argument. *See Robins v. Clinkenbeard*, No. 01-19-00059-CV, 2020 WL 237943, at *8–11 (Tex. App.—Houston [1st Dist.] Jan. 16, 2020, no pet.) (mem. op.) (concluding that various objections to affidavits filed in response to TCPA motion to dismiss were waived because of inadequate briefing).

23

639 (Tex. 2018) ("If a statement is not verifiable as false, it is not defamatory. Similarly, even when a statement is verifiable as false, it does not give rise to liability if the 'entire context in which it was made' discloses that it is merely an opinion masquerading as a fact. (citations omitted) (citing *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002))).

- Did Miller publish the statements? "'Publication' occurs if the defamatory statements are communicated orally, in writing, or in print to some third person who is 'capable of understanding their defamatory import and in such a way that the third person did so understand.'" *Exxon Mobile Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017).

- Were Miller's statements false? We assume that Miller's statements involved a matter of public concern and follow the precedent of our court that Watkins bore the burden to establish the statements' falsity. *See Van Der Linden v. Khan*, 535 S.W.3d 179, 199–200 (Tex. App.—Fort Worth 2017, pet. denied) (stating that in a suit between a private plaintiff and a private defendant, the plaintiff bore the burden to establish falsity because the statements involved a matter of public concern).

A number of Miller's statements were statements of fact. Her statements that Watkins had created false Facebook profiles, had stalked her, and had done things—

such as punishing her daughter for associating with Miller's daughter by making the child sleep on the floor after removing the furniture from her room—were verifiable.

Miller "published" the statements. The record contains the declarations of two other parents stating that Miller had referenced Watkins and that they understood the defamatory content of the statements. Certainly, Miller specifically identified Watkins in her communications to school officials and to the police. Nothing suggests that those recipients were incapable of understanding the potential defamatory content of Miller's statements or could misconstrue that Miller was making particular statements of misconduct involving Watkins.

With respect to falsity, Watkins stated that she had not stalked Miller's social media accounts or had abused her daughter in the way that Miller claims that she did in the statements that Miller made to third parties. In essence, at the TCPA motion-to-dismiss stage of this case, this is a case of she said/she said in which one party claims an event occurred, and the other claims that it did not. The nature of the acts is such that we do not know what proof Watkins could be expected to produce at this point in order to present prima facie proof other than to deny that the acts occurred. Miller presented no specific evidence to document that Watkins had created false profiles to troll her on social media; she simply asserted that Watkins had done so.[4] We are unsure how Watkins would prove the negative that she had not created false

---

[4]The only unstruck record reference to support the "trolling" claim was some unspecified statement allegedly made to Miller by Watkins's son. We know nothing about the age of the son or what he said.

25

social media accounts at this point in the litigation when Miller's statement provided no particulars on how she had done so. Miller also claimed that Watkins had punished her daughter in a particular way, and Watkins also presented proof that she had not taken the actions that Miller claimed regarding punishing her daughter.

Our situation is similar to the one we faced in *Van Der Linden*, a case in which a defendant allegedly said that a plaintiff had given money to a terrorist organization, and the plaintiff denied that he had made the statement. *See id.* at 198. We noted that in a situation where there were only two parties to the communication, the plaintiff could do no more than deny that he had made the statement. *Id.* Here, as in *Van Der Linden*, the clash between the statement that an action occurred and the denial that it did is evidence that the person making the statement spoke falsely.

### 4. With regard to the second element of defamation, there is prima facie proof that Miller's statements about Watkins were reasonably capable of a defamatory meaning.

The elementary question in establishing that a statement is defamatory turns on whether it "tends [] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Innovative Block*, 603 S.W.3d at 417 (quoting Restatement (Second) of Torts § 559 (Am. Law Inst. 1977)). Whether the statement is defamatory is a legal question. *Id.* at 419–20.

To answer whether a statement is reasonably capable of defamatory meaning poses two questions: (1) whether the meaning that the plaintiff assigns to the

26

statements is reasonably capable of arising from the text of which the plaintiff complains; and (2) whether the meaning ascribed to the statement by the plaintiff—if that meaning is reasonably ascribed to the statement—is reasonably capable of defaming the plaintiff. *Tatum*, 554 S.W.3d at 625.

The Texas Supreme Court recently established new categories to address these questions and abandoned—other than for the purpose of presuming general damages—the long-used categories of defamation per se and per quod as descriptors of whether a statement was defamatory "by its text alone." *Id.* The supreme court established two broad categories of statements with the distinctions between the two turning on whether the face of statement carried a potentially defamatory sting or whether that sting could be found only if extrinsic evidence were introduced to explain it. *Id.* at 626–27. The two categories were given labels that correspond to their ability to convey meaning with or without the resort to extrinsic evidence, with the category not requiring extrinsic, explanatory evidence being textual defamation and the one requiring extrinsic evidence being extrinsic defamation. *Id.*

As a further breakdown, textual defamation contains two subclasses. The first is an explicit textual defamation. *Id.* at 627. Explicit textual defamation needs no interpretive effort to discern the point that the defendant is making. The supreme court described such a statement as being when the statement's "literal text and its communicative content align—what the statement *says* and what the statement

*communicates* are the same. In other words, the defamation is both *textual* and *explicit*."

*Id.*

The second category of textual defamation is implicit textual defamation. *Id.* at 627–28. This category requires interpretation of the statement. *Id.* at 627. To unearth whether a statement carries an implicit defamatory meaning, a judge views the statement from the perspective of an "objectively reasonable reader [who] internalizes all of a publication's reasonable implications." *Id.* at 631. The court, viewing the statement from such an observer's perspective, must parse the statement and apply the following test:

> [I]f a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established. But if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication will be deemed capable of bearing that meaning.

*Id.* at 635.

In this case, we need not go through the process of drawing out an implicit meaning from Miller's statements. The statements that we focus on are that Watkins has created false profiles to access and then misuse her social media account and that Watkins has gone to the length of punishing her daughter for associating with Miller's daughter by moving furniture out of her daughter's room and forcing the child to sleep on the floor. These statements are an explicit description of the conduct that

28

Miller claims Watkins has engaged in, i.e., what the statement says and what the statement communicates are the same—Watkins did certain specified acts.

Our second step is to determine if Miller's statements were capable of a defamatory meaning. The supreme court offered the following broad guidelines to make this determination:

> In Texas, a statement is defamatory libel by statute if it "tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." Tex. Civ. Prac. & Rem. Code [Ann.] § 73.001. In addition, under our state's common law, a statement is defamatory per se when it is "so obviously harmful that general damages, such as mental anguish and loss of reputation, are presumed." *Lipsky*, 460 S.W.3d at 596; *see also Hancock* [*v. Variyam*], 400 S.W.3d [59,] 63 [Tex. 2013)]. For example, "[a]ccusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct" constitutes defamation per se. *Lipsky*, 460 S.W.3d at 596; *see also Moore*, 166 S.W.3d at 384. Moreover, "[r]emarks that adversely reflect on a person's fitness to conduct his or her business or trade are also deemed defamatory per se." *Lipsky*, 460 S.W.3d at 596.

*Id.* at 637–38.

Relevant to the facts we analyze, an accusation of child abuse is an accusation of a crime and—to use outdated parlance—defamatory per se. *See Lozano v. Lozano*, 983 S.W.2d 787, 793 (Tex. App.—Houston [14th Dist.] 1998), *aff'd in part, rev'd in part on other grounds*, 52 S.W.3d 141 (Tex. 2001).

Further, in Texas, it is a crime to engage in online impersonation. *See* Tex. Penal Code Ann. § 33.07. The elements of the offense are as follows:

29

(a) A person commits an offense if the person, without obtaining the other person's consent and with the intent to harm, defraud, intimidate, or threaten any person, uses the name or persona of another person to:

> (1) create a web page on a commercial social networking site or other Internet website; or

> (2) post or send one or more messages on or through a commercial social networking site or other Internet website, other than on or through an electronic mail program or message board program.

*Id.* § 33.07(a).

The two statements made by Miller that we focus on are reasonably capable of defaming Watkins. To claim that a parent goes to the length of making a child sleep on the floor to punish the child for associating with another child merely because the parent does not like the playmate's parent would, in our view, be an allegation of abuse that could involve both the police and CPS. The other parents who filed declarations stated that Miller had characterized Watkins as abusive and unsafe in the treatment of her daughter and that the daughter no longer wished to live with Watkins. According to one of Miller's emails, she needed to involve CPS because Watkins should not be around children. Indeed, Miller's brief argues that her comments were matters of public concern because they involved acts of abuse that were reportable to authorities.[5] Also, Miller was open about making the allegations

---

[5]Miller's brief cites the following Family Code Sections:

because she wanted Watkins's presence removed from the school. Thus, the statements had a direct impact on Watkins's ability to be a substitute teacher.

Further, Miller claimed that Watkins had committed acts that are accusations of the crime of online impersonation. Though Miller later tried to assert that she had never filed a formal police report specifically accusing Watkins of a crime, she sent a police report to the school stating that she had told police "that she believe[d] that Watkins ha[d] been creating false Facebook profiles in order to spy and send messages to other individuals to 'slander' Miller." In the report that Miller shared with the school, police stated that they had "advised Miller of the law regarding online impersonation and that there could possibly be a criminal charge if Watkins ha[d] been using information of another person to create profiles and using them with the intent to harm Miller." Miller made similar allegations to school officials and other parents. In essence, Miller published statements that Watkins had performed acts that

---

- Section 261.001(1)(A), which defines abuse as "mental or emotional injury to a child that results in an observable and material impairment in the child's growth, development, or psychological functioning";
- Section 261.001(5)(D), which defines a "[p]erson responsible for a child's care, custody, or welfare" as "a person who traditionally is responsible for a child's care, custody, or welfare," including "school personnel or a volunteer at the child's school"; and
- Section 261.101(a), which states that "[a] person having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person shall immediately make a report as provided by this subchapter."

Tex. Fam. Code Ann. §§ 261.001(1)(A), (5)(D), 261.101(a).

potentially constituted a crime and then provided the school with a report from police that outlined the nature of the alleged criminal offense that might have been committed based on the acts that Miller had accused Watkins of doing. Such an accusation is reasonably capable of defaming Watkins.

**5. With regard to the third element of defamation, there is prima facie proof that Miller acted with the requisite degree of fault.**

The parties dispute what level of fault should gauge whether Miller acted with a requisite degree of fault. Miller contends that Watkins was a limited-purpose public figure; thus, Watkins carried the burden to establish that Miller acted with actual malice. Watkins disputes her status as a limited-purpose public figure and argues that she was required to present proof only that Miller acted negligently. The trial court resolved the issue by finding that Watkins's status as a limited-purpose public figure presented a question of fact and by stating that "[w]ithout finding whether [Watkins] was a public figure for a limited purpose, the admissible evidence submitted by [Watkins] was sufficient to overcome the Motion to Dismiss even under the *New York Times Co. v. Sullivan* . . . heightened standard of proof."

We adopt a similar approach to that of the trial court and assume, without deciding, that the heightened burden of proof of actual malice applies to Watkins's defamation claim. We need not resolve the question of what burden applies because there is prima facie proof that Miller acted with actual malice.

32

Because we assume that Watkins bore the burden of presenting prima facie proof that Miller acted with actual malice, we will be succinct in describing the mare's nest of how courts decide what level of fault on the part of a defendant accused of defamation must be proven. The Texas Supreme Court described how Texas law has evolved on the issue in response to holdings from the United States Supreme Court as follows:

> We have revised the elements of the defamation cause of action in response to the United States Supreme Court's application of constitutional principles to defamation claims. Before *Sullivan*, . . . the defamation plaintiff generally prevailed by proving the defendant published a statement that defamed her unless the defendant proved the truth of the statement. Pierre N. Leval, *The No–Money, No–Fault Libel Suit: Keeping Sullivan in Its Proper Place*, 101 Harv. L. Rev. 1287, 1287 (1988). But the Supreme Court held in *Sullivan* that freedom of expression requires "breathing space," and that if the plaintiff is a public official, she must prove the defendant had actual malice. 376 U.S. at 272, 279–80, 84 S. Ct. [at 721, 726]. The Court later held that public figures and limited[-]purpose public figures must also prove actual malice, and that states may set their own level of fault for private plaintiffs. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 347, 94 S. Ct. 2997, [3009–3010] (1974). The Court left the precise standard of fault to the states, and we have chosen a negligence standard for a private figure seeking defamation damages from a media defendant. *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998); *see also Gertz*, 418 U.S. at 353, 94 S. Ct. [at 3014] (Blackmun, J., concurring) ("[T]he Court now conditions a libel action by a private person upon a showing of negligence, as contrasted with a showing of willful or reckless disregard."); Restatement (Second) of Torts § 580B (1977). *In light of these holdings, to recover defamation damages in Texas, a plaintiff must prove the media defendant: (1) published a statement; (2) that defamed the plaintiff; (3) while either acting with actual malice (if the plaintiff was a public official or public figure) or negligence (if the plaintiff was a private individual) regarding the truth of the statement. McLemore*, 978 S.W.2d at 571.

*Neely v. Wilson*, 418 S.W.3d 52, 61 (Tex. 2013) (footnotes omitted) (emphasis added).

33

The plaintiff, who bears the burden of proving actual malice, falls into three classes: public officials, general-purpose public figures, and public figures for a limited purpose. *McLemore*, 978 S.W.2d at 571. No one contends that Watkins should be characterized as a general-purpose public figure, which requires a person to "have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts." *See Lane v. Phares*, 544 S.W.3d 881, 886 (Tex. App.—Fort Worth 2018, no pet.) (quoting *McLemore*, 978 S.W.2d at 571). Instead, the dispute below was whether Watkins is a limited-purpose public figure where a party may hold public-figure status "for a limited range of issues surrounding a particular public controversy." *See id.* Courts look to three factors in deciding whether a party should be characterized as a limited-purpose public figure:

> (1) the controversy at issue must be public both in the sense that people are discussing it and that people other than the immediate participants in the controversy are likely to feel the impact of its resolution;
>
> (2) the plaintiff must have more than a trivial or tangential role in the controversy; and
>
> (3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*Id.* at 887 (citing *Neely*, 418 S.W.3d at 70).

34

Also, as stated above, a public official may bear the burden of proving actual malice. Neither party addresses whether the fact that Watkins was a substitute teacher makes her a public official. We will not decide that question but will observe that there is a nationwide split on the question of whether a public-school teacher is a public official.[6]

Again, we sidestep the raft of issues required to decide whether Watkins is a limited-purpose public figure or a public official by our holding that there is prima facie proof that Miller acted with actual malice. To begin that discussion, we note the difficulty in applying the actual-malice standard to our facts. As we explained, the

---

[6]Arizona, Connecticut, Ohio, Oklahoma, Tennessee, and Washington hold that public-school teachers are public officials. *See Sewell v. Brookbank*, 581 P.2d 267, 270 (Ariz. Ct. App. 1978); *Kelley v. Bonney*, 606 A.2d 693, 710 (Conn. 1992); *Bowman v. Parma Bd. of Educ.*, 542 N.E.2d 663, 668 (Ohio Ct. App. 1988); *Johnston v. Corinthian Television Corp.*, 583 P.2d 1101, 1102 (Okla. 1978); *Campbell v. Robinson*, 955 S.W.2d 609, 611 (Tenn. Ct. App. 1997); *Corbally v. Kennewick Sch. Dist.*, 973 P.2d 1074, 1077 (Wash. Ct. App. 1999).

States that hold the opposite include California, Florida, Idaho, Maine, New York, and Virginia. *See Franklin v. Lodge 1108, Benevolent & Protective Order of Elks*, 159 Cal. Rptr. 131, 135 (Cal. Ct. App. 1979); *Nodar v. Galbreath*, 462 So. 2d 803, 808 (Fla. 1984); *Verity v. USA Today*, 436 P.3d 653, 663 (Idaho 2019); *True v. Ladner*, 513 A.2d 257, 264 (Me. 1986), *superseded by statute on other grounds as recognized in Grossman v. Richards*, 722 A.2d 371, 373 (Me. 1999); *Dec v. Auburn Enlarged Sch. Dist.*, 672 N.Y.S.2d 591, 593 (N.Y. App. Div. 1998); *Richmond Newspapers, Inc. v. Lipscomb*, 362 S.E.2d 32, 37 (Va. 1987).

At least two Texas intermediate appellate courts have held that public-school teachers are not public officials. *See Poe v. San Antonio Express-News Corp.*, 590 S.W.2d 537, 540 (Tex. App.—San Antonio 1979, writ ref'd n.r.e.) (refusing to conclude that a school teacher is a public official); *Johnson v. Sw. Newspapers Corp.*, 855 S.W.2d 182, 186 (Tex. App.—Amarillo 1993, writ denied) ("[W]e do not hold, and no Texas case has held, that a school teacher is a public official.").*

35

actual-malice standard's primary purpose is to protect media commentary on matters of public concern.

Here, we deal with a controversy that began as a private email sent by one parent to a co-parent addressing a parenting concern about their daughter. That private communication was shared with a third party, and the third party viewed the statements in the private email as justification for creating a public dispute that involved other parents, school officials, and the police. The actual-malice standard seems a poor fit for the dispute between Miller and Watkins when that standard is calibrated to deal with the media. *See Cummins v. Bat World Sanctuary*, No. 02-12-00285-CV, 2015 WL 1641144, at *2–9 (Tex. App.—Fort Worth Apr. 9, 2015, pet. denied) (per curiam) (mem. op.) (describing the evolution of the actual-malice standard and stating that "[n]either the United States Supreme Court nor the Texas Supreme Court has seen the need to adjust defamation law in light of the changes in technology"). Because the actual-malice standard involves media behavior, the standard often involves determinations of whether the investigative work of the media was done in a way that reveals actual malice. These standards provide little guidance on what we have already described as a she said/she said situation in which Miller claims that Watkins has abused her daughter by making her sleep on the floor and has "trolled" and has stalked Miller's social media accounts and in which Watkins asserts that those claims are false. In this unique situation, we conclude that the fact that the

36

parties' stories are so at odds with each other provides evidence supporting an inference of actual malice.

As a beginning point, to say the standards governing the actual-malice determination are imprecise is an understatement. The standards turn on the subjective awareness of the defendant, and an injurious motive impacts the determination, though that motive is not determinative. The Tyler Court of Appeals recently explored the parameters of the actual-malice determination as follows:

> To establish actual malice, a plaintiff must show a defamatory statement was published with either knowledge of its falsity or reckless disregard for its truth. *Lipsky*, 460 S.W.3d at 593. Reckless disregard is a subjective standard, focusing on the defendant's state of mind. *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 171 (Tex. 2003) (citing *Bentley* . . . , 94 S.W.3d [at] 591 . . . ). Mere negligence is not enough. *Id.* "Rather, the plaintiff must establish 'that the defendant in fact entertained serious doubts as to the truth of his publication,' or had a 'high degree of awareness of . . . [the] probable falsity' of the published information." *Id.* (quoting *Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S. Ct. 2678, 2696 . . . (1989)). The evidence must be viewed in its entirety. *Campbell* [*v. Clark*], 471 S.W.3d [615,] 629 [Tex. App.—Dallas 2015, no pet.)]. Further, "[a] defendant's state of mind 'can—indeed, must usually—be proved by circumstantial evidence.'" *Id.* (quoting *Bentley*, 94 S.W.3d at 591). Specifically, the supreme court stated the following:

>> A lack of care or an injurious motive in making a statement is not alone proof of actual malice, but care and motive are factors to be considered. An understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice. A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is.

*Id.* (quoting *Bentley*, 94 S.W.3d at 597). In addition, the supreme court stressed that proof of actual malice is not defeated by a defendant's self-serving protestation of sincerity. *Id.*

*MediaOne, L.L.C. v. Henderson*, 592 S.W.3d 933, 942–43 (Tex. App.—Tyler 2019, pet. denied). Actual malice must be established by clear and convincing evidence. *Bentley*, 94 S.W.3d at 596.

In searching for guidance to decide how the actual-malice standard applies to our facts, we note that the United States Supreme Court in *St. Amant v. Thompson* held that evidence that a story has been fabricated may be evidence of malice. 390 U.S. 727, 732, 88 S. Ct. 1323, 1326 (1968). The Texas Supreme Court relied on the following language from *St. Amant* when describing the actual-malice standard under Texas law:

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. *Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination,* or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Bentley*, 94 S.W.3d at 596 (quoting *St. Amant*, 390 U.S. at 732, 88 S. Ct. at 1326) (emphasis added) (footnotes omitted).

Though they are not a precise analogy, cases dealing with allegations of sexual assault provided some guidance on how to apply the actual-malice standard in a case in which the private parties' stories were dramatically opposed. For example, a federal district court in Kansas dealt with a defamation claim based on a Facebook post accusing the plaintiff of a rape that had occurred in a private setting. *See Chastain v. Hodgdon*, 202 F. Supp. 3d 1216, 1221–22 (D. Kan. 2016) (mem. & order). The plaintiff denied that the sexual assault had occurred. *Id.*

*Chastain* explained how the fact that the parties' stories were at odds prevented the dismissal of the case for a failure to provide evidence of actual malice as follows:

> Defendant states that plaintiff cannot provide evidence that defendant knew the allegations regarding the sexual assault or attempted rape were false and therefore cannot show actual malice. The court finds defendant's arguments unpersuasive. In her Facebook post, defendant stated that plaintiff sexually assaulted or attempted to rape her, going into great detail in her narrative. Such recounting from defendant's perspective necessarily requires a lucid memory of the event as experienced by defendant herself. *Of course, if the event forming the basis of defendant's accusation never occurred, as the court is required to assume at this stage, such a first-person narrative would require that defendant knew that the events were false because she necessarily never experienced them. If defendant knew that the events were false, and nonetheless wrote the detailed narrative describing exactly how plaintiff [had] sexually assaulted or attempted to rape her when it actually never occurred, it is axiomatic that she wrote the narrative with actual malice[] or actual knowledge that it was false.*

*Id.* (emphasis added). As *Chastain* also explained when denying a motion to reconsider, "because defendant and plaintiff were the only two direct actors in events that either did or did not occur, plaintiff's claim of falsity supports both that the statement was false and that defendant necessarily knew it was false at the time she

said it—because, according to him, it never occurred." *Chastain v. Hodgdon*, No. 16-2087, 2016 WL 5109944, at *2 (D. Kan. Sept. 20, 2016) (mem. & order).

In *Ratner v. Kohler*, another federal court dealt with a similar fact pattern as that in *Chastain.* Civ. No. 17-00542 HG-KSC, 2018 WL 1055528 (D. Haw. 2018) (order). *Ratner* highlighted that it was operating—as are we—outside the usual ambit of a journalistic setting. *See id.* at *8. As *Ratner* explained,

> This case is not a defamation case against a publisher or a journalist investigating events about third parties. Rather, the Complaint here alleges that Defendant Kohler knew her Facebook post was false when she published it because the events she recounted never took place. Plaintiff Ratner alleges that Defendant's Facebook post was wholly fabricated.

*Id. Ratner* held that a dispute regarding whether an event had occurred was evidence of fabrication and relied on California authority of similar import to the language we quoted from the Texas Supreme Court's *Bentley* opinion where the California courts held "that actual malice may be inferred if the plaintiff demonstrates that the defamatory statement had no basis in fact, was fabricated by the defendant, or was the product of her imagination." *Id.* at *9.

Here, Watkins denied that she had stalked Miller on Facebook and had made fake profiles so that she could "friend" Miller and watch her social media. Later in her declaration, Watkins stated, "I never created fake social media accounts for any reason. I do not share [] Miller's posts." Watkins denied that she had taken "everything out of [her] daughter's room and [had] forced her to sleep on the floor of

40

her bedroom as a punishment for being friends with [] Miller's daughter." Watkins attached a photo to her declaration showing that her daughter's room was furnished and asserted that the photo showed the state of the room at the time when Miller had accused Watkins of removing the furniture. Watkins's declaration stated that Miller knew that the claims that she had made against Watkins were "false and [were] known by [] Miller to be false."[7]

Watkins also presented evidence of an injurious motive on Miller's part. As we have noted, the other parents who filed declarations stated that Miller had said that she was "going after" Watkins and that she had used Facebook to "retaliate" against parents with whom she disagreed. Further, Miller apparently made efforts to have Watkins removed from teaching the art class in question and from the school, but she tried to retrench by claiming that she had done so only after the school had lied about what her daughter had said. This is circumstantial evidence that Miller herself

---

[7]The only statements that Miller made in her declaration about what she suspected Watkins had done were as follows:

> I suspected that Michelle Watkins created a fake social media account to spy on me because Michelle Watkins sent photos of my Facebook profile to others. I questioned whether Michelle Watkins's behavior was a crime because it did not seem right. I asked the local police department what the law was[,] but they referred me to Aubrey ISD's complaint process.

Watkins objected to this paragraph, and the trial court sustained the objection. Miller raises no issue on appeal that the trial court erred by sustaining the objection.

41

apparently feared how her statements and actions might throw her motive into question.

To determine if there is prima facie proof of actual malice, we look to circumstantial evidence of whether from a subjective viewpoint, "the defendant in fact entertained serious doubts as to the truth of his publication,[] or had a []high degree of awareness of . . . [the] probable falsity[] of the published information." *MediaOne*, 592 S.W.3d at 942–43. Here, one private party claims that acts occurred, the other private party denies that the same acts occurred. The events here occurred in circumstances unlike those that traditionally involve actual malice where the basis for a journalistic claim can be tested. In essence, each one claims that the other is lying, and we have no means to decide who speaks the truth. If Miller indeed fabricated her allegations, then she by definition entertained serious doubts about them and had a high degree of awareness of the statements' falsity.

Further, though an injurious motive is not determinative of actual malice, it is a factor that may be considered. Here, Miller's words and actions create an inference of an injurious motive. Miller's ire that Watkins had made the statements about her (although the statements were made to the limited audience of Watkins's ex-husband) is obvious. Her words were that she was going after Watkins and that her social media posts were a method of retaliation. This evidence raises an inference of an injurious motive and in combination with the other evidence is relevant to Miller's

42

subjective belief regarding whether her statements were true. The record supports an inference that Miller acted with actual malice.

### 6. With regard to the fourth element of defamation, there is prima facie proof that Watkins has suffered damages.

Because the statements by Miller that we conclude are defamatory constitute defamation per se, it is presumed that Watkins has suffered general damages. Even if we could not rely on a presumption, Watkins presented prima facie proof that she has experienced mental anguish.

As we noted above, though the terms have fallen out of favor in describing the defamatory sting of a statement, the terms defamation per se and defamation per quod remain viable in determining whether the statement produces a presumption of damage. *Tatum*, 554 S.W.3d at 626.

> The distinction between defamation per se and per quod is as follows:

> Historically, defamation *per se* has involved statements that are so obviously hurtful to a plaintiff's reputation that the jury may presume general damages, including for loss of reputation and mental anguish. A statement that injures a person in her office, profession, or occupation is typically classified as defamatory *per se*. Defamation *per quod* is defamation that is not actionable *per se*.

*Hancock*, 400 S.W.3d at 63–64 (footnotes omitted). Again, "[a]ccusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct are examples of defamation per se." *Lipsky*, 460 S.W.3d at 596.

43

The existence of defamation per se permits a presumption of general damages, though that presumption is subject to qualifications depending on the context of the statement. As the Texas Supreme Court has explained,

> Actual or compensatory damages are intended to compensate a plaintiff for the injury she incurred and include general damages (which are non-economic damages such as for loss of reputation or mental anguish) and special damages (which are economic damages such as for lost income). Historically in Texas, defamation *per se* claims allow the jury to presume the existence of general damages without proof of actual injury. *Bentley* . . . , 94 S.W.3d [at] 604 . . . ; *see also* Restatement (Second) of Torts § 621 cmt. a (1977). But the First Amendment requires competent evidence to support an award of actual or compensatory damages when the speech is public or the level of fault is less than actual malice. *See* [*Time, Inc. v.*] *Firestone*, 424 U.S. [448,] 459, 96 S. Ct. 958[, 968 (1976)]; *Gertz*, 418 U.S. at 349–50, 94 S. Ct. [at 3012]. Thus, the Constitution only allows juries to presume the existence of general damages in defamation *per se* cases where[] (1) the speech is not public, or (2) the plaintiff proves actual malice. *See Dun & Bradstreet*[*, Inc. v. Greenmoss Builders, Inc.*], 472 U.S. [749,] 761, 105 S. Ct. 2939[, 2946 (1985)]; *Gertz*, 418 U.S. at 349–50, 94 S. Ct. [at 3012].

*Hancock*, 400 S.W.3d at 65–66 (footnote omitted).

Also, prima facie proof of a viable defamation per se claim frees the party responding to a TCPA motion to dismiss from having to present clear and specific evidence of general damages. *Lipsky*, 460 S.W.3d at 596 ("Pleading and proof of particular damage is not required to prevail on a claim of defamation per se, and thus actual damage is not an essential element of the claim to which the TCPA's burden of clear and specific evidence might apply.").

Here, Miller accused Watkins of two potential crimes—child abuse and online impersonation. Further, Miller's allegations—that Watkins is an evil and vindictive

44

mother as demonstrated in part by her abusive actions toward her own daughter—would strike at Watkins's ability to be a substitute teacher and obviously were used by Miller for that purpose. Thus, we consider these statements to be defamatory per se. Further, to the extent that the statements have a public component, we have also already concluded that Watkins presented prima facie proof that the statements were made with actual malice. Thus, we conclude that the presumption of general damages frees Watkins from having to present prima facie proof of damages.

Alternatively, if we are wrong in applying the presumption of general damages, then we conclude that Watkins presented prima facia proof of mental anguish. Generally, "[m]ental anguish is only compensable if it causes a 'substantial disruption in . . . daily routine' or 'a high degree of mental pain and distress.'" *Hancock*, 400 S.W.3d at 68 (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)). In essence, proof of compensable mental anguish looks to the degree of emotion it produces:

> [I]n a sufficiency review, we "must distinguish between shades and degrees of emotions," such as "between disappointment and severe disappointment, between embarrassment and wounded pride, [and] between anger and indignation." *Parkway*, 901 S.W.2d at 444. "We apply a traditional no-evidence standard to a mental anguish finding to determine whether the record reveals any evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 916–17 (Tex. 2008) (quotation omitted).

*Patel v. Hussain*, 485 S.W.3d 153, 178 (Tex. App.—Houston [14th Dist.] 2016, no pet.). But "[g]eneralized, conclusory descriptions of how an event affected a person are

insufficient evidence on which to base mental anguish damages." *Anderson v. Durant*, 550 S.W.3d 605, 619 (Tex. 2018) (quoting *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 232 (Tex. 2011)).

Watkins's declaration contains more than conclusory and superficial descriptions of the anguish that she claims to have suffered as shown by the following:

21. I love teaching art. This past 2019–2020 school year was my second year to do so and [was] my first year in charge of the Meet the Masters Program at Brockett Elementary. Before all of Carlye Miller's actions that are a part of this lawsuit happened, I would dress up like the artist or from the time period to engage with the students. After [Miller] did what she did (and is continuing to do), I did not dress up as often. When I did get dressed up, I would get very anxious each time before I knew Ms. Miller was going to be at the school to help with her children's classes. She had never helped as a parent volunteer in the art room for all the years I had taught the art program. I knew that she was saying false things about me, and her presence in the classroom was frightening and intimidating and extremely upsetting.

22. A few days after [Miller] made her Facebook post that is attached to Kelly Casey's declaration in Exhibit 2, [Miller] was up at the school decorating for an event. I would have normally stayed to help with decorating (as I have done for almost every event), but I did not feel comfortable. I said hello to my friends and left. The stress of knowing [that] she could email the school[] or [that] I would have to talk to the principal about her "demands" was causing me to be anxious[,] and my stomach would often hurt. I felt uneasy going to the school for any reason in fear she might be there or show up. I saw my regular doctor on 11/14/19 to discuss any options for my stress or anxiety. Around this time (early November 2019)[,] I also started counseling with Janie Grimes (who has since retired). I discussed the situation [involving] Ms. Miller many times during my sessions.

23. When Ms. Miller was in the classroom, I would do my best to teach and focus on the children, but her hostile presence would be very

46

distracting. I have broken down in the school a few times when I just could not hold in my stress from her constantly attacking me on Facebook and to the school.

24. Once she falsely accused me of abusing my daughter to the school and to peers, I felt she had taken it too far. The fact that she would bring my daughter in[to] the middle of this issue was very upsetting. This affected both my daughter and [me] because I was having to discuss adult issues [with] her about Mrs. Miller. I usually keep my children out of adult matters, as they do not need to be concerned or worried at their ages about those things.

25. The weight of her continuous false claims against me has affected my overall physical and mental well-being. I have gained weight since last Fall 2019[,] and I have taken less interest in things I usually enjoy outside of the classroom. I took time off as a substitute teacher this year because I wanted to focus on art. My plan was to continue to teach art next school year, but unless things improve materially, I just do not feel I would be able to focus properly on the art and the students knowing Ms. Miller would or could cause any more mental or potentially physical harm to me or my family.

Watkins's relatively detailed statements of the anguish that she has suffered establish prima facie proof of mental-anguish damages. In reaching this conclusion, we rely on opinions from the Texas Supreme Court reviewing mental-anguish awards on appeal and compare the holdings of these cases to Watkins's statements.

The following are examples of the supreme court's descriptions of emotions that were sufficient to sustain a finding of mental anguish:

- "The plaintiff testified [that] he lost time with his friends and family, spent time worrying at home, and was distressed about the impact the defamatory statements had on him and his family within their community." *Id.* (describing testimony in *Bentley*, 94 S.W.3d at 606–07).

47

- A widow whose husband's grave was desecrated "testified [that] she was anxious for years about whether her own grave would be desecrated, was afflicted with headaches, could not sleep, and suffered stress that caused burning in her stomach. She sought medical treatment for these issues and was prescribed medication for anxiety and depression." *Id.* at 619–20 (footnote omitted) (describing testimony in *Serv. Corp. Int'l*, 348 S.W.3d at 233).

- "[T]estimony [of plaintiff] reflect[ed] a substantial disruption in his life. His familial relationships were impacted; his demeanor changed; he was unable to sleep; and he was treated for anxiety and depression." *Id.* at 620.

By comparing Watkins's testimony to the quoted descriptions of emotions that would support a recovery for mental anguish, we conclude that she presented clear and specific prima facie evidence of mental anguish. Watkins's routines at school and with her daughter have been disrupted. She claims that she has experienced physical symptoms from the emotions produced by Miller's actions. She has discussed the stress produced by what she has experienced with medical care providers. She has altered her work plans. At this preliminary stage of the litigation, such evidence carries Watkins's burden to present clear and specific evidence that she has suffered mental anguish.[8]

---

[8]One of Miller's arguments that we have not addressed is that Watkins failed to plead her claim adequately, and for this reason, the trial court should have granted the motion to dismiss. We are unsure what to make of the argument. The TCPA

**C.** **Miller's brief is so deficient that she has waived any argument that Watkins failed to present clear and specific evidence supporting the elements of her tortious-interference claim.**

Watkins also sued Miller for tortious interference with her contract to act as a substitute teacher. The trial court found that "[Watkins] has satisfied her burden of proof to proceed on her causes of action for defamation and tortious interference." Miller's brief, for the most part, drops the question of whether the trial court erred by finding that Watkins had carried the burden on her tortious-interference claim. Miller's brief contains exactly two references to the term tortious interference. The extent of Miller's argument dealing with that cause of action is as follows:

> Here, [Watkins] failed to establish facts by clear and convincing evidence that supported her defamation and tortious[-]interference claims. [Watkins] filed into the Clerk's Record a business[-]record[s] affidavit of Aubrey ISD and attached records and four supporting declarations. The business records provided by Aubrey ISD support the fact that [Miller] followed proper channels for complaining about an approved and qualified substitute teacher and volunteer. The Aubrey ISD records support the fact that [Miller] petitioned the school district through its formal and informal complaint processes.

---

provides that the trial court is to consider the pleadings *and* evidence in resolving a motion to dismiss. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(a). We have detailed the evidence that Watkins presented. We also noted that Watkins filed a supplemental petition that went into elaborate detail outlining the statements that Miller allegedly made. Further, Miller cites no case to support her position that a case in the procedural stance of this one could be determined based on a defective pleading. There is a question of whether a party responding to a TCPA motion to dismiss may rely solely on its pleadings to present evidence of a prima facie claim. *See Buzbee v. Clear Channel Outdoor, LLC.*, No. 14-19-00512-CV, 2020 WL 6738021, at *9–10 (Tex. App.—Houston [14th Dist.] Nov. 17, 2020, no pet. h.). But Watkins went far beyond reliance on her pleadings in establishing her prima facie case for defamation.

. . . .

[Watkins] conceded in Paragraph 25 of her Declaration that it was [her] own decision to not teach. [Watkins] stated that "Carlye Miller tried to get my contract terminated or revoked" but later stated that[] ultimately it would be [Watkins's] own "fear" and not [Miller's] attempts to get her fired that would keep [Watkins] from teaching.

[Watkins] conceded in Paragraph 29 of her Declaration that [she] ha[d] yet to lose her ability to substitute teach.

. . . .

. . . [Watkins] presented no evidence that [Miller's] actions rose to the level of tortious interference with actual or prospective contract because [Watkins] was at all times in full control over whether she wanted to substitute teach—[Watkins] testified in her Declaration that it was [her] own decision to not teach.

Miller's brief lacks citation to any authority addressing tortious interference and does not state how, in the context of a TCPA motion to dismiss, a party presents prima facie proof of a legal action asserting that cause of action. The brief does not even cite authority outlining what the elements of the cause of action are. We have strived mightily to coax out arguments testing whether Watkins presented prima facie proof of the elements of a defamation claim, but it is beyond our role as an appellate court to take on the job of completely briefing and then arguing a party's appeal for her. Miller waived error on the issue of whether there was prima facie proof of Watkins's tortious-interference action by inadequately briefing her argument. *See* Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

50

Essentially, Miller leaves it up to us to brief her issue, and we have no duty to do so. *See Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.). Because Miller's argument is inadequately briefed, we hold that it is waived. *See Jackson v. Vaughn*, 546 S.W.3d 913, 922 (Tex. App.—Amarillo 2018, no pet.).

**D.** **On the record before us, Miller has not established that this case should be dismissed because Watkins failed to comply with the Texas Defamation Mitigation Act.**

Miller argues that Watkins lacks "standing" to sue her for defamation because Watkins failed to comply with the Texas Defamation Mitigation Act (DMA). *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 73.051–.062. In support of this argument, Miller makes a categorical assertion that Watkins failed to comply with the DMA because she never requested a retraction of Miller's allegedly defamatory statements. Watkins's declaration, however, states that she did seek a retraction. Further, the DMA requires a timely challenge to the sufficiency of a retraction request, and the record contains no indication that a challenge was filed. We overrule Miller's argument because she fails to establish that the error she asserts actually occurred or that any potential error was brought to the trial court's attention.

The Texas Supreme Court recently explained the history and function of the DMA as follows:

> The DMA was enacted in 1993 "to provide a method for a person who has been defamed by a publication or broadcast to mitigate any perceived damage or injury." The statute advances that objective by providing sticks and carrots to induce plaintiffs and defendants to take prompt action to rectify defamatory publications so any ensuing

51

damages are ameliorated. The Act applies to "all publications" in whatever form and all "claim[s] for relief, however characterized, from damages arising out of harm to personal reputation caused by the false content of a publication."

*Warner Bros. Entm't, Inc. v. Jones*, 611 S.W.3d 1, 10 (Tex. 2020) (footnotes omitted)

(citing Tex. Civ. Prac. & Rem. Code Ann. §§ 73.052, .054).

The moving parts of the DMA in broad outline form are as follows:

- Section 73.055(a) provides that "[a] person may maintain an action for defamation only if" (1) the person or an authorized attorney or agent "made a timely and sufficient request for a correction, clarification, or retraction from the defendant" (Request) or (2) the defendant has actually "made a correction, clarification, or retraction" with or without a request. Tex. Civ. Prac. & Rem. Code Ann. § 73.055(a).

- Section 73.055(b) states that a Request is "timely if made during the period of limitation for commencement of an action for defamation." *Id.* § 73.055(b).

- Section 73.055(d) specifies on whom the Request should be made and the terms that it should contain. *Id.* § 73.055(d).

- Section 73.055(c) limits the recovery of exemplary damages if the Request is made more than ninety days "after receiving knowledge of the publication." *Id.* § 73.055(c).

- Section 73.057 specifies what constitutes a timely and sufficient correction, clarification, or retraction. *Id.* § 73.057.

- Section 73.058 provides how a defendant may rely on a correction that it issues and when a defendant must challenge the sufficiency and timeliness of a Request. *Id.* § 73.058.

- Section 73.059 provides that "[i]f a correction, clarification, or retraction is made in accordance with this subchapter, regardless of whether the person claiming harm made a [R]equest, a person may not recover exemplary damages unless the publication was made with actual malice." *Id.* § 73.059.

52

Miller's argument recites various parts of Section 73.055 and then makes the following two-sentence argument:

> Here, it is impossible for [Watkins] to meet the clear and convincing standard required by Tex. Civ. Prac. & Rem. Code [Ann.] § 27 because [she] failed to provide any evidence that she satisfied the statutory conditions precedent to bring her claim. [Watkins] did not have standing to bring suit for defamation.

Miller's brief does not give any record citations showing that she raised this argument in the trial court, and we cannot find such argument in the record.

Watkins responds to Miller's argument by attaching to her brief (1) a letter requesting retraction that she allegedly sent to Miller and (2) Miller's counsel's response to the letter. Although it is not surprising that the letters are not a part of our record because the issue was not raised in the trial court, we may not consider the letters that Watkins attached to her brief because they are not part of the appellate record in this case. *See WorldPeace v. Comm'n for Lawyer Discipline*, 183 S.W.3d 451, 465 n.23 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("[W]e cannot consider documents attached as appendices to briefs and must consider a case based solely upon the record filed."). However, the record refutes Miller's statement that there is no evidence that Watkins complied with the DMA. First, Watkins's declaration filed in support of her response to Miller's TCPA motion to dismiss states,

> Carlye Miller's claim that I filed a lawsuit against her without any warning is false. My attorney sent her a letter seeking a retraction of her false claims and statements about me before the lawsuit was filed. Carlye Miller made no response to the letter whatsoever. The lawsuit was not filed until after she failed to respond to that letter.

53

And second, Miller testified at one of the hearings conducted by Aubrey ISD that her lawyer had drafted an agreement: "I'm praying that she does the agreement that my lawyer has set up[,] but we still don't know."

Miller also fails to acknowledge the provision of the DMA that requires her to raise a challenge to the sufficiency of the request for retraction in the trial court. Specifically, Section 73.058(c) of the DMA provides,

> If a defendant intends to challenge the sufficiency or timeliness of a [R]equest for a correction, clarification, or retraction, the defendant must state the challenge in a motion to declare the [R]equest insufficient or untimely served not later than the 60th day after the date of service of the citation.

Tex. Civ. Prac. & Rem. Code Ann. § 73.058(c). The Texas Supreme Court described this provision as "explicitly and unequivocally plac[ing] the onus on [the defendant] to raise an objection within 60 days after being served with the defamation lawsuit" in order to challenge the sufficiency of a Request for correction, clarification, or retraction under Section 73.055. *Warner Bros. Entm't*, 611 S.W.3d at 13. The supreme court went on to state that "the DMA explicitly puts the burden on defendants in a defamation lawsuit to timely (1) object if Section 73.055(a)(1) has not been satisfied and (2) point to a [c]hange if they think it will reduce their damages exposure." *Id.* at 16. Neither Miller's brief nor the record contains any suggestion that she invoked Section 73.058(c) to challenge the Request for retraction that the record indicates that Watkins sent.

"[T]he burden is on a party appealing from a trial court judgment to show that the judgment is erroneous in order to obtain a reversal." *Murray v. Devco, Ltd.*, 731 S.W.2d 555, 557 (Tex. 1987). Here, we face an argument that relies on a factual statement that no Request for retraction was made when the record contradicts that statement. And the uncertainty regarding whether a Request for retraction was made then raises another question that we are not in a position to answer—whether Miller waived a challenge to the sufficiency of the Request for retraction by failing to challenge as required by Section 73.058(c). We cannot guess our way to a resolution of Miller's argument.[9]

We have addressed the arguments that Miller raises in support of her first issue and have rejected them. Accordingly, we overrule Miller's first issue.

### E. We reject Miller's argument that Watkins's request for injunctive relief should be reviewed as a discreet "legal action" that is subject to dismissal under the TCPA.

In her second issue, Miller attacks what she characterizes as Watkins's third cause of action—Watkins's request for temporary injunctive relief. Miller offers a litany of reasons why a request for injunctive relief is invalid and should have been dismissed; these include that the request is an attempt to change the parenting

---

[9]Miller's brief also fails to recognize that there is a split of authority on the issue of whether the remedy for failure to comply with the DMA is dismissal and that the issue is presently pending before the Texas Supreme Court. *See MediaOne*, 592 S.W.3d at 945 (discussing split between courts of appeals); *Zoanni v. Hogan*, 555 S.W.3d 321, 328 (Tex. App.—Houston [1st Dist.] 2018, pet. granted) (pending before supreme court on petition for review that raises the question of the proper remedy for a failure to comply with DMA).

arrangements ordered in a decree of divorce between Watkins and her ex-husband and that an injunction would impair Miller's ability to exercise a number of her constitutional rights. The fact is that the trial court did not grant any injunctive relief and stated that it would not impose a prior restraint on Miller's speech. But more fundamentally, Miller's attack is misdirected; Watkins's request for injunctive relief is not a separate legal action to which a TCPA motion to dismiss may be directed.

A TCPA motion to dismiss is directed to a "legal action." *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.003(a) ("If a legal action is based on or is in response to a party's exercise of the right of free speech, right to petition, or right of association . . . [,] that party may file a motion to dismiss the legal action."). It is the consensus of the intermediate appellate courts that a request for injunctive relief is not a discrete legal action that is subject to dismissal under the TCPA; instead, "[a] temporary injunction is a remedy that is available only if a probable right to relief has been established in connection with a cause of action." *Stone*, 2020 WL 6143126, at *5. The Fourteenth Court of Appeals cataloged cases from various courts of appeals, including our own, holding that a request for injunctive relief may not be separately challenged under the TCPA as a discrete legal action. *Id.* Specifically, the Fourteenth noted that

> [a]t least the First, Second, Third[,] and Fifth Courts of Appeals have determined the TCPA does not allow a request for injunctive relief to be separately challenged when it is linked to a cause of action. *See Cavin v. Abbott*, [613 S.W.3d 168, 172 (Tex. App.—Austin 2020, no pet. h.)] (holding that TCPA did not apply to daughter's request for injunction

56

prohibiting father from contacting daughter through any means of communication, where injunctive relief was dependent on daughter's underlying claim for father's wrongful act of assault); . . . *Bui* . . . , 2019 WL 5151410, at \*5–6 . . . (stating that injunctive relief was a remedy tied to a defamation claim and "a remedy request is not separately challengeable apart from the cause of action to which it is linked"); *Van Der Linden* . . . , 535 S.W.3d [at] 203 . . . (holding that "injunctive relief is a remedy, not a stand-alone cause of action" in suit for tortious interference with a contract, tortious interference with prospective business relations, and defamation); *cf. Ruder v. Jordan*, No. 05-14-01265-CV, 2015 WL 4397636, at \*6 (Tex. App.—Dallas July 20, 2015, no pet.) (mem. op.) (declining to review separately trial court's denial of TCPA dismissal of injunctive relief because it was ancillary to defamation claims already reviewed). We agree with these sister courts.

*Id.* Thus, up to this point our opinion has focused on whether there is prima facie proof of the causes of action asserted in Watkins's legal action, not the viability of ancillary relief that she sought but did not receive. We will not address whether the trial court should have separately dismissed her request for injunctive relief when that ancillary relief is not a legal action properly subject to a TCPA motion to dismiss.

We overrule Miller's second issue.

## IV. Conclusion

Having overruled Miller's first and second issues, we affirm the trial court's order denying Miller's TCPA motion to dismiss.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: March 11, 2021

57